

Villanova University School of Law
Villanova University School of Law Digital Repository

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-1998

# Smith v. Natl Collegiate

Precedential or Non-Precedential:

Docket 97-3346

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Smith v. Natl Collegiate" (1998). *1998 Decisions.* Paper 49.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/49

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 16, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-3346 and 97-3347

R. M. SMITH,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

Renee M. Smith,

        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 96-01604)

Argued February 12, 1998

BEFORE: GREENBERG, NYGAARD and MCKEE,
Circuit Judges.

(Filed: March 16, 1998)

        Renee M. Smith (argued)
        5426 Fifth Avenue
        Shadyside Inn
        Pittsburgh, PA 15232

         Pro Se

        Larry A. Silverman
        Christine A. Ward
        Dickie, McCamey & Chilocote
        Two PPG Place
        Suite 400
        Pittsburgh, PA 15222-5402

John J. Kitchin (argued)
Robert W. McKinley
Swanson, Midgeley, Gagwere,
 Kitchin & McLarney
922 Walnut
Suite 1500
Kansas City, MO 64106

 Attorneys for Appellee

Marcia D. Greenberger
Deborah L. Blake (argued)
National Women's Law Center
11 DuPont Circle, N.W.
Suite 800
Washington, D.C. 20036

Attorneys for Amici Curiae National
Women's Law Center, American
Association for Active Lifestyles &
Fitness, American Association of
University Women, AAUW Legal
Advocacy Fund, American Civil
Liberties Union, Center for Women
Policy Studies, The Connecticut
Women's Legal Fund, Equal Rights
Advocates, Inc., National
Association for Girls and Women In
Sport, National Coalition for Sex
Equity in Education, National
Education Association, NOW Legal
Defense and Education Fund, Trial
Lawyers for Public Justice, Wider
Opportunities for Women, Women
Employed, Women's Law Project,
Women's Legal Defense Fund,
Women's Sports Foundation, and
The Young The YWCA of the USA

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Renee M. Smith, a pro se litigant, appeals from the
district court's order of May 21, 1997, dismissing her
complaint for failure to state a claim, and from the district
court's order of June 5, 1997, denying her motion for leave
to amend her complaint. Smith's complaint alleges
violations of section 1 of the Sherman Act, 15 U.S.C. S 1,
and Title IX of the Educational Amendments of 1972, 20
U.S.C. S 1681, as well as a state law breach of contract
claim against the National Collegiate Athletic Association
("NCAA"). Smith's allegations arise from the NCAA's
promulgation and enforcement of a bylaw prohibiting a
student-athlete from participating in intercollegiate
athletics while enrolled in a graduate program at an
institution other than the student-athlete's undergraduate
institution.

The district court had jurisdiction over the federal claims
in this matter pursuant to 28 U.S.C. SS 1331 and 1337 and
15 U.S.C. S 15, and over the state law claim pursuant to 28
U.S.C. S 1367. This court has jurisdiction to review the final
orders of the district court pursuant to 28 U.S.C. S 1291.[1]

_____

1. According to the NCAA rules, a student-athlete is eligible to participate
in intercollegiate athletics for a total of four seasons within a five-year
period. Because Smith's five year-period of eligibility has expired and,
according to the NCAA her complaint seeks only declaratory relief, the
NCAA concludes that her Title IX claim is moot. We disagree.

Smith's Title IX claim is not moot although her period of eligibility has
expired because she retains a claim for damages. See Ellis Bhd. of Ry.,
Airline & S.S. Clerks, 466 U.S. 435, 442, 104 S.Ct. 1883, 1889 (1984)
(holding that a claim is not moot where there is a viable damages claim);
National Iranian Oil Co. v. MAPCO Int'l, Inc., 983 F.2d 485, 489 (3d Cir.
1992); Jersey Cent. Power & Light Co. v. New Jersey, 772 F.2d 35, 41
(3d Cir. 1985). Although count II of Smith's complaint, which asserts a
Title IX claim, states that "[t]his action is a request for a declaratory

3

We exercise plenary review over the district court's dismissal of Smith's complaint for failure to state a claim. See Lake v. Arnold, 112 F.3d 682, 684 (3d Cir. 1997). We accept all of her allegations as true, view them in the light most favorable to her, and will affirm the dismissal only if she can prove no set of facts entitling her to relief. See Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996); ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 (3d Cir. 1994). We review the district court's denial of her motion for leave to amend her complaint for abuse of discretion. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

## II. FACTS AND PROCEDURAL HISTORY

Smith graduated from high school in the spring of 1991 and enrolled in St. Bonaventure University the following fall, where she participated in Division I athletics. Smith played intercollegiate volleyball for St. Bonaventure during the 1991-92 and 1992-93 athletic seasons. By her choice, Smith did not participate in intercollegiate volleyball for St. Bonaventure during the 1993-94 season.

Smith graduated from St. Bonaventure in two and one half years. Thereafter, she enrolled in a postbaccalaureate program at Hofstra, and then in 1995 she enrolled in a second postbaccalaureate program at the University of Pittsburgh. St. Bonaventure did not offer either of these postbaccalaureate programs.

The NCAA is an unincorporated association comprised of public and private colleges and universities and is responsible for promulgating rules governing all aspects of intercollegiate athletics, including recruiting, eligibility of student-athletes, and academic standards. The member

_____

relief challenging sex discriminatory practices and policies of the NCAA . . . in violation of Title IX," her complaint also includes a clause which prays for additional relief including damages and any further relief which the court finds appropriate. App. at 5. In our view, a fair reading of the complaint establishes that it asserts an action for damages under Title IX. See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 112 S.Ct. 1028 (1992) (holding that a claim for damages exists in an action to enforce Title IX).

4

institutions agree to abide by and enforce these rules. The NCAA denied Smith eligibility to compete for Hofstra and the University of Pittsburgh in the 1994-95 and 1995-96 athletic seasons, respectively, based upon Bylaw 14.1.8.2 in the NCAA Manual (the "Postbaccalaureate Bylaw"). The Postbaccalaureate Bylaw provides that a student-athlete may not participate in intercollegiate athletics at a postgraduate institution other than the institution from which the student earned her undergraduate degree. 2 Both Hofstra and the University of Pittsburgh applied to the NCAA for a waiver of the bylaw with respect to Smith, but the NCAA denied both requests. Smith was, however, in good academic standing and in compliance with all other NCAA eligibility requirements for the 1994-95 and 1995-96 athletic seasons.

In August 1996, Smith instituted this suit challenging the NCAA's enforcement of the bylaw as well as the NCAA's refusal to waive the bylaw in her case. More particularly, Smith alleged that the Postbaccalaureate Bylaw is an unreasonable restraint of trade in violation of section 1 of the Sherman Act and the NCAA's refusal to waive the bylaw excluded her from intercollegiate competition based upon her sex in violation of Title IX. Smith also asserted a state law breach of contract claim based upon the NCAA's denial of eligibility. On May 21, 1997, the district court dismissed Smith's federal claims for failure to state a claim upon which relief could be granted. The court held that the

_____

2. The bylaw at issue provides that

> [a] student-athlete who is enrolled in a graduate or professional school of the institution he or she previously attended as an undergraduate (regardless of whether the individual has received a United States baccalaureate degree or its equivalent), a student-athlete who is enrolled and seeking a second baccalaureate or equivalent degree at the same institution, or a student-athlete who has graduated and is continuing as a full-time student at the same institution while taking course work that would lead to the equivalent of another major or degree as defined and documented by the institution, may participate in intercollegiate athletics,
provided
> the student has eligibility remaining and such participation occurs within the applicable five-year or 10-semester period . . . .

Rule 14.1.8.2 of NCAA Manual.

5

NCAA's refusal to waive the bylaw was not the type of action to which the Sherman Act applied. It also held that Smith's complaint did not allege adequately that the NCAA was a recipient of federal funding so as to be subject to Title IX. By the same order, the district court exercised its discretion to dismiss Smith's state law contract claim pursuant to 28 U.S.C. S 1367(c). See Smith v. National Collegiate Athletic Ass'n, 978 F. Supp. 213 (W.D. Pa. 1997).

Thereafter, Smith submitted a proposed amended complaint and moved the district court for leave to amend her complaint, which the district court denied "as moot" on June 5, 1997. Smith filed timely appeals from these orders, which we have consolidated.

III. DISCUSSION

A. SHERMAN ACT CLAIM

Count I of Smith's complaint alleges that the NCAA, in promulgating and enforcing the Postbaccalaureate Bylaw, violated section 1 of the Sherman Act because the bylaw unreasonably restrains trade and has an adverse anticompetitive effect. As we have indicated, the district court dismissed this claim for failure to state a claim upon which relief could be granted, holding that "the actions of the NCAA in refusing to waive the Postbaccalaureate Bylaw and allow the Plaintiff to participate in intercollegiate athletics is not the type of action to which the Sherman Act was meant to be applied." See Smith, 978 F. Supp. at 218. Smith argues that the district court erred in limiting the application of the Sherman Act to the NCAA's commercial and business activities. We disagree.

Section 1 of the Sherman Act provides, in relevant part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. S 1. Although the section literally prohibits "every" contract, section 1 does not preclude all restraints on trade, but only those that are unreasonable. See National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 98 &

n.17, 104 S.Ct. 2948, 2959 & n.17 (1984); Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 342–44, 102 S.Ct. 2466, 2472–73 (1982). The Clayton Act, 15 U.S.C. SS 15, 26, grants a private right of action to, inter alia, a person "injured in his business or property" by a violation of section 1 of the Sherman Act.3

Smith misconstrues the law in arguing that the Supreme Court has refused to limit antitrust remedies to commercial interests. The cases she cites address whether the plaintiffs alleged injuries within the meaning of the Clayton Act; in that context, the Court held that the statute was not limited to redressing injuries to commercial interests. See Reiter v. Sonotone Corp., 442 U.S. 330, 338–89, 99 S.Ct. 2326, 2330 (1979) (holding that "injury to business or property" was not limited to commercial interests); Blue Shield of Va. v. McCready, 457 U.S. 465, 473, 102 S.Ct. 2540, 2545 (1982) (holding that a subscriber to a health plan who had employed the services of a psychologist alleged a redressable antitrust injury); see also McNulty v. Borden, Inc., 474 F. Supp. 1111, 1115–18 (E.D. Pa. 1979) (holding that an employee of an alleged antitrust violator was injured in his business or property). The question which we now face is different; it is whether antitrust laws apply only to the alleged infringer's commercial activities. Thus, rather than focus on Smith's alleged injuries, we consider the character of the NCAA's activities.

In this regard, we recognize that the Supreme Court has suggested that antitrust laws are limited in their application to commercial and business endeavors. Thus, the Court has explained that

    [the Sherman Act] was enacted in the era of`trusts'

_____

3. Section 4 of the Clayton Act provides:

    [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. S 15.

> and of `combinations' of businesses and of capital
> organized and directed to control of the market by
> suppression of competition in the marketing of goods
> and services, the monopolistic tendency of which had
> become a matter of public concern. The end sought (by
> these laws) was the prevention of the restraints to the
> competition in business and commercial transactions
> which tended to restrict production, raise prices or
> otherwise control the market to the detriment of
> purchasers or consumers of goods and services, all of
> which had come to be regarded as a special form of
> public injury.

Apex Hosiery Co. v. Leader, 310 U.S. 469, 492-93, 60 S.Ct.
982, 992 (1940). The Court also has noted that "in Apex [it]
recognized that the Act is aimed primarily at combinations
having commercial objectives and is applied only to a very
limited extent to organizations . . . which normally have
other objectives." Klor's, Inc. v. Broadway-Hale Stores, Inc.,
359 U.S. 207, 213 n.7, 79 S.Ct. 705, 710 n.7 (1959).

The Supreme Court addressed the applicability of the
Sherman Act to the NCAA in National Collegiate Athletic
Ass'n v. Board of Regents, 468 U.S. 85, 104 S.Ct. 2948,
holding that the NCAA's plan to restrict television coverage
of intercollegiate football games violated section 1. The
Court discussed the procompetitive nature of the NCAA's
activities such as establishing eligibility requirements as
opposed to the anticompetitive nature of the television plan.
See id. at 117, 104 S.Ct. at 2969. Yet, while the Court
distinguished the NCAA's television plan from its rule
making, it did not comment directly on whether the
Sherman Act would apply to the latter.

Although insofar as we are aware no court of appeals
expressly has addressed the issue of whether antitrust laws
apply to the NCAA's promulgation of eligibility rules, cf.
McCormack v. National Collegiate Athletic Ass'n, 845 F.2d
1338, 1343 (5th Cir. 1988) (assuming without deciding that
the NCAA's eligibility rules were subject to antitrust
scrutiny and holding that the "no-draft" and "no-agent"
rules do not have an anticompetitive effect), many district
courts have held that the Sherman Act does not apply to
the NCAA's promulgation and enforcement of eligibility

8

requirements. See Gaines v. National Collegiate Athletic Ass'n, 746 F. Supp. 738, 744-46 (M.D. Tenn. 1990) (holding that antitrust law cannot be used to invalidate NCAA eligibility rules, but noting in dicta that the"no-agent" and "no-draft" rules have primarily procompetitive effects); Jones v. National Collegiate Athletic Ass'n, 392 F. Supp. 295, 303 (D. Mass. 1975) (holding that antitrust law does not apply to NCAA eligibility rules); College Athletic Placement Servs., Inc. v. National Collegiate Athletic Ass'n, 1975-1 Trade Cas. (CCH) P 60,117, available in 1974 WL 998, *2, *3 (D.N.J. 1974) (holding that the NCAA's adoption of a rule furthering its noncommercial objectives, such as preserving the educational standards of its members, is not within the purview of antitrust law), aff'd , 506 F.2d 1050 (3d Cir. 1974) (table).

We agree with these courts that the eligibility rules are not related to the NCAA's commercial or business activities. Rather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics. Based upon the Supreme Court's recognition that the Sherman Act primarily was intended to prevent unreasonable restraints in "business and commercial transactions," Apex, 310 U.S. at 493, 60 S.Ct. at 992, and therefore has only limited applicability to organizations which have principally noncommercial objectives, see Klor's, Inc., 359 U.S. at 214 n.7, 79 S.Ct. at 710 n.7, we find that the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements.4

_____

4. The recent decision of the Court of Appeals for the Tenth Circuit in Law v. National Collegiate Athletic Ass'n, No. 96-3034, 1998 WL 23710 (10th Cir. Jan. 23, 1998), does not alter our result. At issue in Law was the NCAA's bylaw restricting entry-level coaches' annual compensation. The court held that although the restriction was a horizontal price restraint, which is usually per se invalid, the rule of reason applied because certain products, such as intercollegiate sports, require horizontal restraints in order to exist. See id. at *5-*6 (citing National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. at 100-01, 104 S.Ct. at 2959-60).

The bylaw at issue in Law concerned a restriction on the business activities of the institutions, whereas the Postbaccalaureate Bylaw does

Moreover, even if the NCAA's actions in establishing eligibility requirements were subject to the Sherman Act, we would affirm the district court's dismissal of this claim. The NCAA's eligibility requirements are not "plainly anticompetitive," National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365 (1978), and therefore are not per se unreasonable, see National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. at 101, 104 S.Ct. at 2960 (refusing to apply per se rule to NCAA's television plan because the NCAA is involved in an industry where horizontal restraints are necessary to the availability of the product); McCormack, 845 F.2d at 1343–44; College Athletic Placement Servs., 1975–1 Trade Cas. (CCH) P 60,117, available in 1974 WL 998, *3. Consequently, if the eligibility requirements were subject to the Sherman Act, we would analyze them under the rule of reason.

Under the "rule of reason" test, a court considers all relevant factors in determining a defendant's purpose in implementing the challenged restraint and the effect of the restraint on competition, see Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367–68 (3d Cir. 1996) (citing Board of Trade of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44 (1918)), and asks essentially whether the challenged rule promotes or hinders competition. See McCormack, 845 F.2d at 1344.

As noted above, the Supreme Court has recognized the procompetitive nature of many of the NCAA's restraints, including eligibility requirements. See National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. at 117, 104 S.Ct. at 2969. According to the Supreme Court,

> [w]hat the NCAA and its member institutions market in this case is competition itself--contests between competing institutions. Of course, this would be

_____

not. Because our analysis regarding the applicability of the Sherman Act focuses on the distinction between commercial and noncommercial activities, Law is inapposite. Further, because of the significant difference in the nature of the bylaw at issue in Law and the Postbaccalaureate Bylaw, the Law court's rule of reason analysis is not instructive here.

10

> completely ineffective if there were no rules on which
> the competitors agreed to create and define the
> competition to be marketed. A myriad of rules . . .
> must be agreed upon, and all restrain the manner in
> which institutions compete. . . . Thus, the NCAA plays
> a vital role in enabling [intercollegiate sports] to
> preserve its character, and as a result enables a
> product to be marketed which might otherwise be
> unavailable. In performing this role, its actions widen
> consumer choice . . . and hence can be viewed as
> procompetitive.

Id. at 101–02, 104 S.Ct. at 2960–61 (footnote omitted). In
particular, the Court explained that "[i]t is reasonable to
assume that most of the regulatory controls of the NCAA
are justifiable means of fostering competition among
amateur athletic teams and therefore procompetitive
because they enhance public interest in intercollegiate
athletics" and suggested that rules establishing eligibility
requirements of student-athletes were such controls, while
rules limiting television broadcasts were not. See id. at 117,
104 S.Ct. at 2969.

While the parties have not cited any opinion addressing
the particular bylaw at issue here, and we have found
none, other courts have held that the NCAA's "no-draft"
and "no-agent" rules, which disqualify a student-athlete
from further intercollegiate competition if the student-
athlete enters a professional draft or contacts an agent, are
reasonable because they are procompetitive. See
McCormack, 845 F.2d at 1343; Banks v. National Collegiate
Athletic Ass'n, 977 F.2d 1081, 1087–94 (7th Cir. 1992)
(holding that NCAA's "no-draft" and "no-agent" rules do not
have an anticompetitive impact on a discernable market);
Gaines, 746 F. Supp. at 746; Jones, 392 F. Supp. at 304
(noting in dicta that "any limitation on access to
intercollegiate sports is merely the incidental result of the
organization's pursuit of its legitimate goals"); see also
Justice v. National Collegiate Athletic Ass'n, 577 F. Supp.
356, 379 (D. Ariz. 1983) (holding that NCAA sanctions such
as rendering a college team ineligible for post-season play
and for television appearances imposed for violations of rule
against providing compensation to student-athletes did not

11

violate antitrust law because sanctions were reasonably related to the NCAA's goals of preserving amateurism and promoting fair competition).

We agree with these courts that, in general, the NCAA's eligibility rules allow for the survival of the product, amateur sports, and allow for an even playing field. See McCormack, 845 F.2d at 1345. Likewise, the bylaw at issue here is a reasonable restraint which furthers the NCAA's goal of fair competition and the survival of intercollegiate athletics and is thus procompetitive. Clearly, the rule discourages institutions with graduate or professional schools from inducing undergraduates at other institutions to forgo participating in the athletic programs at their undergraduate institutions in order to preserve eligibility to participate in intercollegiate athletics on a postbaccalaureate basis. Likewise, the rule discourages undergraduates from forgoing participation in athletic programs on their own initiative to preserve eligibility on a postbaccalaureate basis at another institution. Indeed, we think that the bylaw so clearly survives a rule of reason analysis that we do not hesitate upholding it by affirming an order granting a motion to dismiss Smith's antitrust count for failure to state a claim on which relief can be granted.

B. TITLE IX CLAIM

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. S 1681(a). Intercollegiate athletics is an educational program or activity within the statute. See 20 U.S.C. S 1687; 34 C.F.R. S 106.41 (a).5

_____

5. The statute defines "program or activity" as

        (2)(A) a college, university, or other postsecondary institution, or a
        public system of higher education; or . . .

        (4) any other entity which is established by two or more of the
        entities described in paragraph (1) (2), or (3);

12

Thus, the NCAA is subject to Title IX provided that it receives federal financial assistance within the meaning of section 1681(a).

Federal regulations define "recipient" as including

> any public or private agency, institution or organization, or other entity, or any other person, to whom Federal financial assistance is extended directly or through another recipient and which operates an educational program or activity which receives or benefits from such assistance, including any subunit, successor, assignee or transferee thereof.

34 C.F.R. S 106.2(h) (1997) (emphasis added). The plain language of the statute and regulation is quite broad and encompasses indirect recipients of federal funds. See Grove City College v. Bell, 465 U.S. 555, 564, 104 S.Ct. 1211, 1216 (1984) (holding that a college received federal funds where the funds were granted to its students asfinancial aid rather than directly to the college because the language of the section does not distinguish between direct and indirect receipt of federal funds).

The Court of Appeals for the Sixth Circuit addressed the applicability of Title IX to a state high school athletic association in Horner v. Kentucky High Sch. Athletic Ass'n, 43 F.3d 265 (6th Cir. 1994). In Horner, the plaintiffs, female student-athletes, alleged that the association received dues from its member high schools, many of which receive federal funds, and that a state statute authorized the designation of the association as an agent of the state

_____

> any part of which is extended Federal financial assistance . . . .

20 U.S.C. S 1687. In addition, federal regulation in part provides that

> [n]o person shall, on the basis of sex, be excluded from participation
> in, be denied the benefits of, be treated differently from another
> person or otherwise be discriminated against in any interscholastic,
> intercollegiate, club or intramural athletics offered by a recipient,
> and no recipient shall provide any such athletics separately on such
> basis.

34 C.F.R. S 106.41(a).

13

board of education. See Ky. Rev. Stat. Ann. S 156.070(1), (2). In that capacity, the association performed the board's statutory duties with respect to interscholastic sports. The plaintiffs alleged that the association violated Title IX by sanctioning fewer sports for girls than boys and by refusing to sanction a particular sport for girls. The court held that the association would be subject to Title IX if the plaintiff could prove her allegations with respect to its functioning and financing. See id.

The district court attempted to distinguish Horner by noting that "even if the [NCAA] receives dues from member schools which receive federal funds, unlike the situation in Horner, there is no statutory connection between the parties such that the Defendant can be considered the `agent' of its member institutions that receive federal financial assistance." See Smith, 978 F. Supp. at 220. Thus, according to the district court, the distinguishing characteristic here is the lack of statutory authority for the NCAA. We disagree. The NCAA acts no less than the association in Horner as an agent of its member institutions merely because it lacks statutory authority for its activities. The NCAA is a voluntary organization created by and comprised of the educational institutions which essentially acts as their surrogate with respect to athletic rules.

In its construction of section 504 of the Rehabilitation Act, which contains language identical to that of Title IX in 20 U.S.C. S 1681(a) regarding receipt of federal assistance,[6] the Supreme Court has indicated that Congress, as in Title IX, did not distinguish between direct and indirectfinancial assistance. See United States Dep't of Transp. v. Paralyzed Veterans of Amer., 477 U.S. 597, 606–07, 106 S.Ct. 2705, 2711–12 (1986) (citing Grove City College, 465 U.S. at 564, 104 S.Ct. at 1216 (holding that a college received federal

_____

6. The Rehabilitation Act states that

> [n]o otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by
> reason of her or his disability, be excluded from the participation in,
> be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. S 794 (emphasis added).

14

funds where the funds were granted to its students as financial aid rather than directly to the college)). The Court, however, drew a distinction between those entities which indirectly benefit from federal assistance and those that indirectly receive federal assistance, holding that only those the receive federal funds are within the statute. Thus, the Court rejected the argument that all commercial airlines are "recipients" of federal funds simply because airport operators receive federal funds which benefit the airlines in the form of runways, inter alia. See id. at 606, 106 S.Ct. at 2711. The Court defined "recipient" from a contractual perspective, limiting "recipients" of federal funds, and therefore the obligations of the act, to those who are in a position to decide whether to "receive" federal funds and thereby accept the concomitant obligations of the statute. See id.7

Notwithstanding the parallel language of the Rehabilitation Act and Title IX, we do not apply the Paralyzed Veterans Court's definition of "recipient" to Title IX in the circumstances here. In our view, the broad regulatory language under Title IX, which defines a recipient as an entity "which operates an educational program or activity which receives or benefits" from federal funds, 34 C.F.R. S 106.2(h) (1997) (emphasis added), requires that we reach a different result. Application of Paralyzed Veterans here would render the regulatory definition of "recipient" under Title IX a nullity. After all, unlike the commercial airlines in Paralyzed Veterans, the NCAA is not merely an incidental beneficiary of federal funds. Quite to the contrary, it seems to us that the relationship between the members of the NCAA and the organization itself is qualitatively different than that between airlines and airport operators, for we think that it

_____

7. The Court noted that "Congress enters into an arrangement in the nature of a contract with the recipients of the[federal] funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." 477 U.S. at 605, 106 S.Ct. at 2711. The Court further noted that "[b]y limiting coverage to recipients, Congress imposes the obligations of S 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not
to `receive' federal funds." Id. at 606, 106 S.Ct. at 2711.

15

would be unreasonable to characterize the latter as surrogates for the airlines. Given the breadth of the language of the Title IX regulation defining recipient, we hold that allegations in Smith's proposed amended complaint, that the NCAA receives dues from its members which receive federal funds, if proven, would subject the NCAA to the requirements of Title IX.

The district court found that Smith's original complaint did not allege that the NCAA was a recipient of federal funds, and therefore dismissed the Title IX claim. See Smith, 978 F. Supp. at 219. Smith's complaint included the following allegation:

> This action is a request for declaratory relief challenging sex discriminatory practices and policies of the NCAA, Hofstra University, and the University of Pittsburgh in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. S 1681. Title IX prohibits sex discrimination in an educational program or activity receiving federal financial assistance.

Compl. P 25. We agree that Smith's original complaint did not contain an allegation that the NCAA receives federal financial assistance. Thus, the district court properly dismissed her original Title IX complaint.[8]

But we have not confined our analysis to Smith's original complaint for, as we have indicated, following the district court's dismissal of her claims, Smith moved for leave to amend her complaint pursuant to Fed. R. Civ. P. 15. By order dated June 5, 1997, the district court denied this motion, stating only that the motion "is denied as moot, the court having granted defendant's motion to dismiss on May 20, 1997." App. at 117. Because the district court gave no further explanation, it is unclear whether the district court was unaware of its discretion to allow the proposed

_____

8. However, Judge McKee would hold that Smith's original complaint sufficiently states that the NCAA receives federalfinancial assistance under the pleading requirements that we apply to pro se complaints. See Zillich v. Lucht, 981 F.2d 694 (3d Cir. 1992) ("When, as in this case, plaintiff is a pro se litigant, we have a special obligation to construe [her]
complaint liberally.").

16

amended complaint despite the dismissal or whether the court believed that the amendment would be futile even if pleaded. Nevertheless, under either view, the district court erred in denying Smith's motion for leave to amend.

Pursuant to Fed. R. Civ. P. 15(a), a plaintiff has an absolute right to amend her complaint once at any time before a responsive pleading is served. Thereafter, a plaintiff must seek leave of the district court to amend her pleading, and although it is within the district court's discretion, district courts should grant such requests freely when justice so requires. Id.

After the district court enters judgment on a motion to dismiss, a plaintiff no longer may amend her complaint as of right. See Newark Branch, NAACP v. Town of Harrison, 907 F.2d 1408, 1417 (3d Cir. 1990); Kauffman v. Moss, 420 F.2d 1270, 1276 (3d Cir. 1970). However, even though Smith no longer was entitled to amend her complaint as of right after the dismissal of her claim, it was within the district court's discretion to grant her leave to amend. See Newark Branch, NAACP, 907 F.2d at 1417; Kauffman, 420 F.2d at 1276; In re Sverica Acquisition Corp. v. Load Rite Trailers, Inc., 179 B.R. 457, 459 (E.D. Pa. 1995); Fearon v. Community Fed. Sav. & Loan of Phila., 119 F.R.D. 13, 15 (E.D. Pa. 1988) (plaintiff had no right to amend where both complaint and action dismissed, but could seek leave of court to do so). Thus, her motion to amend was not moot in the sense of being too late or being foreclosed by the dismissal.

While "the grant or denial of an opportunity to amend is within the discretion of the District Court . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962). On the other hand, a district court justifiably may deny leave to amend on grounds such as undue delay, bad faith, dilatory motive, and prejudice, as well as on the ground that an amendment would be futile. See id.; In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1434; Massarsky v. General Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983). An

17

amendment is futile if the complaint, as amended, would not survive a motion to dismiss for failure to state a claim upon which relief could be granted. See In re Burlington Coat Factory, 114 F.3d at 1434 (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)). In determining whether the amendment would be futile, the district court applies the same standard of legal sufficiency as under Fed. R. Civ. P. 12(b)(6). See id.

Smith alleged facts in her proposed amended complaint which, if proven, would establish that the NCAA was a recipient of federal funds within the meaning of Title IX. Her motion states that she intended the amended complaint to cure any allegational defects, and the proposed amended complaint includes an allegation that the NCAA is an indirect recipient of federal funds. In particular, her proposed amended complaint alleges that "[t]he NCAA is a recipient of federal funds because it is an entity which receives federal financial assistance through another recipient and operates an educational program or activity which receives or benefits from such assistance." App. at 98. This allegation plainly alleges that the NCAA receives dues from member institutions, which receive federal funds. As discussed above, this allegation would be sufficient to bring the NCAA within the scope of Title IX as a recipient of federal funds and would survive a motion to dismiss.

If a district court concludes that an amendment is futile based upon its erroneous view of the law, it abuses its discretion in denying a plaintiff leave to amend to include a legally sufficient allegation. See Centifanti v. Nix, 865 F.2d 1422, 1431 (3d Cir. 1989) (holding that the district court, which erred in its conclusion that there was jurisdictional defect, abused its discretion in denying a plaintiff's motion for leave to amend his complaint because the proposed amendment would not cure the jurisdictional defect). Thus, if the district court denied Smith leave to amend because it viewed the proposed amendments as futile, it erred because the conclusion was based on an error of law. Furthermore, we see no basis to conclude that the district court justifiably could have denied the motion to amend on the grounds that Smith had acted in bad faith, with a dilatory

18

motive, or had delayed unduly in bringing the motion or that granting the motion would prejudice the NCAA. Indeed, there is nothing in the record to support a conclusion that the district court denied the motion to amend on any of these grounds. Overall, therefore, we are satisfied that the district court abused its discretion in denying the motion to amend the complaint.[9]

IV. CONCLUSION

For the foregoing reasons, we will affirm the district court's dismissal of appellant's Sherman Act claim, vacate its dismissal of the Title IX claim, and reverse the district court's denial of her motion for leave to amend her complaint with respect to her Title IX claim. In light of this conclusion, we will remand to the district court for further proceedings consistent with this opinion and direct the district court to reinstate her state law contract claim, over which the district court declined to exercise jurisdiction pursuant to 28 U.S.C. S 1367(c). The parties will bear their own costs on this appeal.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

9. We do not imply that we have any view of the merits of Smith's Title IX claim. The parties have not briefed the merits, and the district court will address those issues on remand if Smith can prove her allegations to support the applicability of Title IX to the NCAA. Thus, we emphasize that we merely hold that the amendment would not have been futile in the sense that it would not have pled adequately that the NCAA was subject to Title IX.

19