**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-1870
_____

JETT ELAD

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil No. 3:25-cv-01981
District Judge: Honorable Zahid N. Quraishi

_____

Argued: September 17, 2025

Before: BIBAS, MONTGOMERY-REEVES, and AMBRO,
*Circuit Judges*.

(Opinion Filed: November 25, 2025)

Daniel S. Epps
Rakesh Kilaru **[ARGUED]**
Wilkinson Stekloff

2001 M Street NW
10th Floor
Washington, DC 20036

Justin M. Kadoura
Kathleen M. Princivalle
Kenneth L. Racowski
Holland & Knight
1650 Market Street
One Liberty Place, Suite 3300
Philadelphia, PA 19103

Duvol M. Thompson
Holland & Knight
787 Seventh Avenue
31st Floor
New York, NY 10019
        *Counsel for Appellant*

Kevin H. Marino **[ARGUED]**
Marino Tortorella & Boyle
437 Southern Boulevard
Chatham Township, NJ 07928
        *Counsel for Appellee*

————————————

OPINION OF THE COURT

————————————

MONTGOMERY-REEVES, *Circuit Judge.*

Student athletes who attend and play for Division I colleges or universities are subject to bylaws enacted by the

National Collegiate Athletic Association ("NCAA"). Jett Elad, a Rutgers University football player, challenges two such bylaws. These bylaws count years spent at Junior Colleges ("JUCOs") towards the NCAA's limit of participation in four seasons of NCAA football over a five-year period (the "JUCO Rule"). Elad argues that the JUCO Rule unreasonably restrains the college-football-athlete labor market in violation of Section 1 of the Sherman Act.

To determine if the JUCO Rule unreasonably restrains, we must analyze its effects on Elad's proposed market. Elad points to, and the District Court accepted, a market definition based on market realities predating the Supreme Court's decision in *NCAA v. Alston*, 594 U.S. 69 (2021). But *Alston* precipitated a widescale market change in college athletics relating to athlete compensation. And when markets change, so too must antitrust analyses. Because Elad's—and by consequence the District Court's—market definition does not account for changed market realities in *Alston*'s wake, we will vacate the District Court's order granting a preliminary injunction and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

The NCAA is composed of approximately 1,100 schools. They play in conferences trifurcated across three divisions: Division I, Division II, and Division III. Each Division passes its own bylaws, which all member institutions,

3

and their student athletes, must follow.[1]  Rutgers is a NCAA Division I school.

Two NCAA Division I bylaws form the basis of this appeal.  These rules, taken together, provide that a student athlete can only: (1) play four seasons of college athletics in any one sport; (2) over a five-year period; and (3) any season played for a JUCO counts towards that time.

Between 2019 and 2024, Elad exhausted his four seasons of NCAA Division I football eligibility over a five-year period at Ohio University, Garden City Community College (a JUCO), and the University of Nevada, Las Vegas ("UNLV").  Because Elad spent one of those four seasons at a JUCO, the JUCO Rule prohibited him from competing in another season of NCAA Division I football despite only playing three seasons of NCAA Division I football.

Elad understood that he had exhausted his eligibility under the JUCO Rule and turned his attention towards the National Football League.  But then the United States District Court for the Middle District of Tennessee held that Vanderbilt

---

[1] All NCAA member schools "must follow [the] rules and policies collectively adopted," and the NCAA's "bylaws have direct impact only on [the member schools]."  Josephine R. Potuto, *The NCAA Rules Adoption, Interpretation, Enforcement, and Infractions Processes: The Laws that Regulate Them and the Nature of Court Review*, 12 VAND. J. ENT. & TECH. L. 257, 267 (2010).  But "[a]n obligation of NCAA membership is that member [schools] must monitor the conduct of those for whom they are responsible and sanction them for violations." *Id.*  In that way, student-athletes are also governed by the NCAA's bylaws. *Id.*

quarterback Diego Pavia—who played two seasons at a JUCO—showed a strong likelihood of success on the merits in his Sherman Act challenge to the JUCO Rule because the rule constrained him from playing another season of NCAA Division I football. *See Pavia v. NCAA*, 760 F. Supp. 3d 527, 534–35 n.6, 543 (M.D. Tenn. 2024). And in doing so, the Middle District of Tennessee introduced an alternative course for Elad—seek a waiver from the NCAA on the strength of *Pavia* and play one more season of NCAA Division I football.

Elad entered the transfer portal—"an online database that lists student-athletes who are interested in changing schools." Appendix (hereinafter "App. __") 226 n.5. Rutgers recruited Elad to play safety for its football team during the 2025-2026 college football season. As an incentive to attract Elad, Rutgers helped him secure an approximately $500,000 name-image-and-likeness ("NIL") contract with Sir Henry Advertising Agency. *See* App. 94–95 (reflecting testimony that Rutgers believed Elad had "great value" and coordinated NIL deals for potential transfers). His NIL deal provided a "life-altering source of revenue for him and his family." App. 226.

Rutgers then sought an NCAA waiver of the JUCO Rule's application to Elad in light of the *Pavia* decision. The NCAA denied Rutgers' request. Rutgers appealed the decision, and the next day Elad filed this action to obtain an injunction that would allow him to play the 2025-2026 season. The District Court granted Elad a preliminary injunction and enjoined the NCAA from counting Elad's one year at a JUCO towards his eligibility under the JUCO Rule. The NCAA timely appealed the injunction.

5

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1332, and we have jurisdiction to consider the District Court's grant of a preliminary injunction under 28 U.S.C. § 1292(a)(1). "We review the District Court's factual findings for clear error, its legal conclusions de novo, and its ultimate grant of a preliminary injunction for abuse of discretion." *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 609 (3d Cir. 2024).

It is well-established that a "preliminary injunction is an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). As such, the movant must make a "clear showing" that an injunction is warranted. *Id.* (quotation omitted). Courts weigh four factors when considering a request for a preliminary injunction: "(1) the movant['s] likelihood of success on the merits; (2) the risk that the movant[] will suffer irreparable harm absent preliminary relief; (3) the balance of equities; and (4) the public interest." *Boynes*, 110 F.4th at 609. "The first two factors are the 'most critical,'" and only when they are both present do we "consider[] the others." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## III.    DISCUSSION

The NCAA argues that the District Court erred in granting the preliminary injunction because Elad failed to show a likelihood of success on the merits.[2] To resolve the

---

[2] The NCAA also challenges the District Court's irreparable harm and balance of the equities conclusions. But we need not consider those factors to resolve this appeal. *See Adams v.*

NCAA's challenge to the preliminary injunction, we first outline the applicable antitrust legal framework. Then, we consider the NCAA's arguments that Elad is not likely to succeed on the merits.

### A.     The Sherman Act's Framework

The Sherman Act was passed in 1890 to combat "the vast accumulation of wealth in the hands of corporations and individuals, the enormous development of corporate organization, the facility for combination which such organizations afforded, [and] the fact that the facility was being used." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 50 (1911). Underlying the Sherman Act is a congressional belief that "market forces 'yield the best allocation' of the Nation's resources." *Alston*, 594 U.S. at 73 (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984)). To facilitate free markets, Section 1 of the Sherman Act specifically prevents "restraint[s] of trade," 15 U.S.C. § 1, "between separate entities," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (emphasis omitted). But any such restraint of "trade" must have a commercial effect,[3] and it

_____

*Freedom Forge Corp.*, 204 F.3d 475, 486 n.10 (3d Cir. 2000) (holding the moving party bears the burden "to prove all elements required for a preliminary injunction").

[3] *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) (describing the Sherman Act as only aiming to prevent "restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services"); *see also Smith v. NCAA*,

must be an "unreasonable" restraint. *Ohio v. Am. Express*, 585 U.S. 529, 540 (2018) (emphasis omitted) (quoting *State Oil Co. v. Khan*, 552 U.S. 3, 10 (1997)). Whether a restraint is "commercial" is thus a threshold requirement for Sherman Act applicability.

When assessing "unreasonable restraints of trade," courts generally apply one of three frameworks—*per se*, quick-look, or rule-of-reason—depending on how obviously anticompetitive the challenged conduct is.[4] *See Alston*, 594 U.S. at 87–93; *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 460–61 (1986). The parties agree that the rule-of-reason framework guides our analysis here.

The rule of reason aims to "distinguis[h] between

---

139 F.3d 180, 185–86 (3d Cir. 1998) (abrogated on other grounds) (understanding *Apex* as limiting antitrust remedies to only commercial restraints); *United States v. Brown Univ.*, 5 F.3d 658, 665 (3d Cir. 1993) ("It is axiomatic that [S]ection [O]ne of the Sherman Act regulates only transactions that are commercial in nature.").

[4] *Cf. Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830–31 (3d Cir. 2010) (discussing the three flavors of antitrust analyses that courts apply in assessing anticompetitive harms under the Sherman Act and identifying that there is "'often no bright line [rule] separating' the different modes of analysis," and the "categories of analysis . . . are less fixed than" the terms that define them "tend to make them appear" (first quoting *Bd. of Regents*, 468 U.S. at 104 n.26; then quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999))).

8

restraints with anticompetitive effect that are harmful to the [market] and restraints stimulating competition that are in the [market's] best interest." *Am. Express*, 585 U.S. at 541 (first alteration in original).[5]  Assessing that distinction requires a robust market analysis in which a court must "conduct a fact-specific [examination] of 'market power and market structure . . . to [determine] the [restraint]'s actual effect' on competition." *Id.* (quoting *Copperweld*, 467 U.S. at 768). Because courts must engage in a robust market analysis, a precisely defined relevant market is essential.  *Id.* at 542–43; *see also Agnew v. NCAA*, 683 F.3d 328, 346 (7th Cir. 2012) (explaining that defining the relevant market is thus "of central importance").  And plaintiff bears the burden to define the

---

[5] Courts analyze non-obvious detrimental market effects through either direct or indirect evidence. The Supreme Court in *American Express* described the difference between direct and indirect evidence as follows:

> Direct evidence of anticompetitive effects would be proof of actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market.  Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.

585 U.S. at 542 (alteration in original) (internal quotations omitted).

9

relevant market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

After a relevant market has been identified, courts typically conduct a three-step burden-shifting test. *Am. Express*, 585 U.S. at 541–42. Under that test, a plaintiff must first prove that the challenged restraint has a "substantial anticompetitive effect" within the identified market. *Id*. at 541. Should the plaintiff carry that burden, the defendant must show a "procompetitive rationale" for the restraint. *Id.* If the defendant meets its burden, the plaintiff then must demonstrate that the "procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.[6]

## B.     The NCAA's Arguments on Appeal

The NCAA challenges the District Court's decision on many fronts. But to resolve this appeal, we need only consider two relating to the likelihood of success on the merits: (1) whether the JUCO Rule is commercial such that the Sherman Act applies; and (2) whether the District Court failed to

---

[6] "These three steps do not represent a rote checklist" and may not be "employed as an inflexible substitute for careful analysis." *Alston*, 594 U.S. at 97. "[W]hat is required to assess whether a challenged restraint harms competition can vary depending on the circumstances . . . . The whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *Id.* (quoting *Cal. Dental*, 526 U.S. at 781).

adequately define the relevant market for its rule-of-reason analysis.

### 1. The JUCO Rule has a Commercial Effect

Relying on our holding in *Smith*, the NCAA first argues that the JUCO Rule, an eligibility rule, is not "commercial" and therefore is not covered by the Sherman Act. 139 F.3d at 185–86. *Smith* can no longer bear the weight the NCAA puts on it.

In *Smith*, a student athlete challenged an NCAA bylaw that prohibited student athletes from competing at any "postgraduate institution" other than the undergraduate institution the student graduated from. *Id.* at 183. We held that the NCAA eligibility rules were "not related to the NCAA's commercial or business activities" and, thus, are not subject to Sherman Act scrutiny. *Id.* at 185–86.

This holding cannot be read consistently with Supreme Court precedent.[7] *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858

---

[7] Indeed, to hold as much would suggest that every rule styled by the NCAA as an "eligibility rule" perpetually is noncommercial and thus immune from Sherman Act scrutiny. As commentators have noted, even rules that ostensibly govern student-athletes' compensation may have eligibility-related consequences. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 262a (4th & 5th eds., 2025). Thus, the NCAA's *Smith* interpretation, taken to its logical conclusion, suggests that all it would have to do to unreasonably restrain trade through compensation restrictions, for example, is label the Sherman Act-violating bylaw an "eligibility bylaw." Such an

(3d Cir. 1996) ("Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel . . . a panel may reevaluate precedent in light of intervening authority" and decline to follow prior precedent if intervening circumstances compel it). In *Alston*, the Supreme Court noted substantial changes to the college sports market over the years. 594 U.S. at 77–80. And it made clear that "static judicial decrees in ever-evolving markets may themselves facilitate collusion or frustrate entry and competition." *Id.* at 99. "If . . . market realities change, so may [a] legal analysis" or legal precedent. *Id.* In light of changed market realities, and the NCAA's ability to reframe even compensation rules as eligibility rules, we can no longer *per se* exclude all NCAA-labeled eligibility rules from Sherman Act scrutiny without first asking whether the specific rule at issue is commercial.

The District Court did not err in holding that the JUCO Rule is commercial because it interferes with Elad's desire to compete in NCAA Division I athletics and profit from that

outcome would fly in the face of the intended expansive reach of the Sherman Act, which is broadly concerned with whether *any* restraint unreasonably restrains a free market, regardless of label. *See Goldfarb v. Va. State Bar*, 421 U.S. 773, 787 (1975) ("Congress intended to strike as broadly as it could in [Section 1] of the Sherman Act . . . ."); *Bd. of Regents*, 468 U.S. at 104 (identifying that the goal of all analytical frameworks under Section 1 is to assess "impact on competition," thus suggesting that any threshold question to Sherman Act scrutiny, at base, must not foreclose inquiry into any restraint that could negatively impact competition even if masquerading as an eligibility rule).

participation. Stated differently, Elad alleges that the JUCO Rule limits his participation in a labor market. And the Supreme Court has long recognized that restraints on labor through association rulemaking that "unduly interfere with the free exercise of the[] rights by those engaged, or who wish to engage, in trade and commerce" are subject to the Sherman Act. *Anderson v. Shipowners Ass'n of Pac. Coast*, 272 U.S. 359, 362–63 (1926) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)) (detailing a series of requirements that shipping associations placed on seamen to access a labor market and finding that the plaintiff stated a Section 1 claim). So the only question left is whether that restraint is an unreasonable restraint on trade.[8]

## 2. The District Court Failed to Define the Relevant Market

The NCAA next contends that the District Court's rule-of-reason analysis fails at its inception because the District Court did not adequately define the relevant market; and, to the extent the District Court intended to adopt Elad's expert's definition of the market, it further erred because that expert

---

[8] We do not hold today that all NCAA eligibility rules are *per se* commercial. We simply hold the JUCO Rule is not exempt from Sherman Act scrutiny. No doubt, the NCAA will be ready and willing to justify most of its eligibility rules should they be challenged under the Sherman Act. And such justifications may prove persuasive. *See Agnew*, 683 F.3d at 338–42. But we need not, and do not, reach these issues here.

submitted no economic evidence to support his conclusions. We agree.[9]

"Because '[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law,' courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."[10] *Am. Express*, 585 U.S. at 542–43 (alteration in original) (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 466–67 (1992)). "[T]he relevant market is defined as 'the area of effective competition.'" *Id.* at 543 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)). And "[t]ypically[,] this is the arena within which significant substitution in consumption or production occurs." *Id.* (quotations omitted). Further, markets should be defined to "'correspond to the commercial realities' of the industry.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)).

But the District Court's opinion failed to define the relevant market altogether; it never made any factual findings regarding the market. Instead, it simply recited Elad's expert's, Dr. Joel Maxcy, identified market—"the labor market for college football athletes in general and NCAA Division I

---

[9] We need not reach the remainder of the NCAA's rule-of-reason arguments because we hold that the District Court erred before reaching the rest of the analysis.

[10] *Cf. NHL v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 470–73 (6th Cir. 2005) (demonstrating a legally sufficient relevant market analysis).

14

football specifically." App. 9 (internal quotations omitted).[11] This failure alone constitutes a legal error because the District Court did not engage in a fact-specific analysis of the relevant market despite the parties' differing opinions on the topic. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 335–36 (3d Cir. 2016).

Even if we assume the District Court intended to rest its relevant market finding on Dr. Maxcy's factual findings, the District Court clearly erred. Dr. Maxcy exclusively relies on *Alston* to define the relevant market;[12] he cites no market

---

[11] The District Court implies in its opinion that it accepted Dr. Maxcy's relevant market because the NCAA's expert, Dr. Frederick Flyer, did not object to it. And Elad contends that Dr. Flyer did in fact adopt the relevant market Dr. Maxcy proposed. The NCAA disagrees, however, that Dr. Flyer agreed to Dr. Maxcy's proposed market. And for good reason; it does not appear that Dr. Flyer ever purported to opine on what the relevant market was, and to the extent he did, he testified why Dr. Maxcy's analysis was economically insufficient. Moreover, the District Court's conclusion that Dr. Flyer did not object to Dr. Maxcy's identified market says nothing of whether Elad—through Dr. Maxcy—carried his evidentiary burden to substantiate the existence and contours of the relevant market.

[12] To the extent that Elad points to *Pavia* as also supporting his market definitions, it too relies almost exclusively on *Alston* or other case law to define the relevant market. *Pavia*, 760 F. Supp. 3d at 539. We do not read Supreme Court precedent as allowing this.

15

evidence or economic data. App. 121–24 (testifying that he did not conduct, or consult, any economic analyses to support his opinions). On its own terms, this reliance fails: Dr. Maxcy's opinion concerns all college-football players—including NCAA Division I and JUCO players—but *Alston* concerned only a specific subset of NCAA Division I football and basketball athletes. *Alston*, 594 U.S. at 80. More fundamentally, Dr. Maxcy predicated his market findings solely on static markets, unsupported by evidence,[13] that *predated* the shifts in the college-football market after *Alston*.[14] Reliance on a previously accepted market, without inspection of current market realities, is antithetical to antitrust legal principles. *See id.* at 93 (observing that college-sports markets have changed significantly and that when "market realities change, so may the legal analysis").[15]

---

[13] *Alston*, 594 U.S. at 86–87 ("[S]ome of the issues most frequently debated in antitrust litigation are uncontested. The parties do not challenge the district court's definition of the relevant market . . . . With all these matters taken as given, we express no views on them."); *see also Fourqurean v. NCAA*, 143 F.4th 859, 870 (concluding that the Supreme Court in *Alston*—sitting as an appellate court—did not make findings as to the relevant market and instead accepted the parties' agreement as to what the relevant market was).

[14] Kassandra Ramsey, *NIL Collectives-Title IX's Latest Challenge*, 41 Cardozo Arts & Ent. L.J. 799, 801 (2023) (detailing the changing college-sports landscape in the wake of compensation rules being relaxed and NIL being introduced).

[15] Elad's collateral estoppel argument fails for the same reason. "[C]hanges in facts essential to a judgment will render

16

Because Dr. Maxcy failed to provide any economic analysis or data to support his market definition, the District Court erred to the extent it relied on Dr. Maxcy's report and testimony to find a likelihood of success on the merits. And because there is no demonstrated likelihood of success on the merits, the District Court abused its discretion in granting a preliminary injunction.

\*　　\*　　\*

There is much interesting debate in the antitrust space about the NCAA, its structure, its history, its rulemaking, the emergence of new commercial realities pervading the college-sports industry, and whether certain NCAA rules unreasonably restrain college-sports markets. But we do not have the requisite information to resolve these important issues in this appeal. Rule-of-reason analyses under Section 1 of the Sherman Act require a well-defined relevant market and cannot rely on antiquated market definitions accepted on different evidence and in a different posture. We therefore must vacate the District Court's preliminary injunction. On remand, it should conduct a relevant market analysis and tease out the changing market realities that it identified in its opinion.

---

collateral estoppel inapplicable in a subsequent action raising the same issues." *Montana v. United States*, 440 U.S. 147, 159 (1979). A relevant market is by its nature a non-static factual inquiry. *Alston*, 594 U.S. at 93. Thus, collateral estoppel does not fit neatly with relevant market findings unless a party can establish that the facts underlying a previous market finding have not changed.

## IV.    CONCLUSION

For the reasons set forth above, we will vacate the order and remand for proceedings consistent with this opinion.