

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2000

# Doug Grant Inc v. Greate Bay Hotel

Precedential or Non-Precedential:

Docket 98-5291

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Doug Grant Inc v. Greate Bay Hotel" (2000). *2000 Decisions.* Paper 230.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/230

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 2, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5291

DOUG GRANT, INC., RICHARD ANDERSEN, JUDY L.
BINTLIFF, LYNN V. BOHSEN, THOMAS M. BOLICK,
MICHAEL BONN, ROLAND BRYANT, SR., EUGENE
CLAUSER, ELMER CONOVER, SCOTT CONOVER,
JOSEPH CURRAN, DINO D'ANDREA, MARK F. D'ANDREA,
WARREN DAVENPORT, FRANK DELIA, KAREN DWYER,
DENNIS F. FOREMAN, ROSEMARIE FRANCIS, STEPHEN
FREEL, STAVROS GEORGIOU, KENNETH GROSS, ADIB
HANNAH, G. HASSAN HATTINA, LEROY N. JORDAN,
ROMAN KERN, RICHARD H. KESSEL, SCOTT KLEE,
JEFFREY S. KRAH, KATHLEEN E. LANE-BOURGEOIS,
THOMAS J. LOTITO, JR., JAMES MACELROY, MAR TIN
MALTER, STANLEY P. MCANALL Y, ANNE T.
MCGOWAN-NOVAK, EUGENE L. MISERENDINO, DANIEL
G. NAUROTH, MATTHEW S. PELLENBERG, DANIEL
PILONE, STEPHEN F. PINCIOTTI, ROBERT E. PROUT,
MARTIN ROSE, LYNN RUFO, VINCENT SALEK, ARLEN
SCHWERIN, JOSEPH SCIOSCIA, WILLIAM F. STRAUSS,
DOUGLAS G. TELMAN, AINO TOMSON, ANTS TOMSON,
THOMAS TOMSON, LINWOOD C. UPHOUSE, DOLORES
VALANCY, ANDREW R. VARDZAL, JR., GRANT DOUGLAS
VON REIMAN, KENNETH J. WARNER, STEVEN W ATTERS,
PAUL V. YANNESSA, DOUG GRANT COLLEGE OF
WINNING BLACKJACK, INC., SIGMA RESEARCH, INC.,
BETA MANAGEMENT, INC., FA VORABLE SITUATIONS
ONLY INC., t/a DOUG GRANT INSTITUTE OF WINNING
BLACKJACK, JAN C. MUSZYNSKI, LINDA TOMPSON,

     Appellants

v.

GREATE BAY CASINO CORPORATION, GREA TE BAY
HOTEL AND CASINO t/a SANDS HOTEL AND CASINO,
SANDS HOTEL AND CASINO, HILTON HOTELS

CORPORATION, GNOC CORP. t/a "A TLANTIC CITY HILTON," ATLANTIC CITY HILTON, BALLY'S PARK PLACE, INC. t/a "BALLY'S PARK PLACE," BALLY'S PARK PLACE, ITT CORPORATION, ITT CORPORATION NV , CAESAR'S WORLD, INC. a/k/a "CAESAR'S ATLANTIC CITY ," CAESAR'S WORLD, CLARIDGE HOTEL & CASINO CORP ., CLARIDGE AT PARK PLACE, INC., HARRAH'S ENTERTAINMENT, INC., MARINA ASSOCIATES d/b/a "HARRAH'S CASINO HOTEL", HARRAH'S CASINO HOTEL, SUN INTERNATIONAL NORTH AMERICA INC., SUN INTERNATIONAL HOTELS LTD., RESORTS INTERNATIONAL HOTEL, INC., RESORTS CASINO HOTEL, SHOWBOAT, INC., SHOWBOAT , AZTAR CORPORATION, ADAMAR OF NEW JERSEY, INC., (formerly Trop World Casino and Entertainment Resort) t/a TROPICANA CASINO AND RESORT, TROPICANA CASINO AND RESORT, TRUMP HOTELS & CASINO RESORTS, INC., TRUMP HOTELS & CASINO RESOR TS HOLDINGS, L. P., TRUMP ATLANTIC CITY A SSOCIATES, TRUMP PLAZA ASSOCIATES, L. P., TRUMP P LAZA ASSOCIATES, TRUMP PLAZA HOTEL AND CASINO, TRUMP TAJ MAHAL ASSOCIATES, TRUMP T AJ MAHAL CASINO RESORT, THE TRUMP ORGANIZA TION, INC., TRUMP'S CASTLE ASSOCIATES, L. P., TRUM P CASTLE ASSOCIATES, TRUMP MARINA CASINO HOTEL RESOR T, formerly Trump's Castle Casino Resort, JOHN DOES 1-100, GRIFFIN INVESTIGATIONS, INTERNATIONAL CASINO SURVEILLANCE NETWORK, L. P., SURVEILLANCE INFORMATION NETWORK, JOHN DOES 101-200, F. MICHAEL DAILY, ESQ., QUINLAN, DUNNE, DAILY & HIGGINS, ELLEN BARNEY BALINT, MERANZE & KATZ, CAPLAN & LUBER, LLOYD S. MARKIND, ESQ., RICHARD L. CAPLAN, ESQ., SHARON MORGAN, ESQ., MICHELE DAVIS, ESQ.

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 97-04291)
District Judge: Honorable Joseph E. Irenas

Argued October 5, 2000

BEFORE: NYGAARD, GREENBERG and COWEN,
Circuit Judges

(Filed: November 2, 2000)

Howard A. Altschuler (argued)
66 Saltonstall Parkway
East Haven, CT 06512

 Attorney for Appellants

Frederick H. Kraus
Sands Hotel & Casino
Indiana Avenue & Brighton Park
Atlantic City, NJ 08401

 Attorney for Appellees
Greate Bay Casino, Greate
Bay Hotel and Sands Hotel
and Casino

Adam N. Saravay (argued)
Tompkins, McGuire,
Wachenfeld & Barry, LLP
4 Gateway Center
Newark, NJ 07102

 Attorneys for the Trump Casino
Appellees and Co-Counsel for the
Remaining Casino Appellees and
Griffin Investigations

John M. Donnelly (argued)
Levine, Staller, Sklar, Chan,
 Brodsky, & Donnelly, P.A.
3030 Atlantic Ave.
Atlantic City, NJ 08401

 Attorneys for Casino Appellees
(other than the Trump Casino
Defendants) and Griffin
Investigations

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes on before this court on appeal from an order entered on May 1, 1998, partially dismissing this action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. 1 See Doug Grant, Inc. v. Greate Bay Casino Corp., 3 F. Supp.2d 518 (D.N.J. 1998). The appellants had instituted this action in the Superior Court of New Jersey but the appellees r emoved it to the district court. Consequently, when the district court entered the Rule 12(b)(6) order it r emanded appellants' state-law claims that it did not addr ess to the Superior Court. In view of the procedural posture of this case, we treat the allegations of fact in the complaint as true, and consider them in a light most favorable to the appellants.2

The individual appellants are blackjack players who have frequented Atlantic City casinos operated by the casino appellees. Of the 60 individual appellants, all but six have developed card-counting skills for playing blackjack enabling them to reduce or eliminate the nor mal odds in

---

1. In our extensive Introduction and at other places in our opinion, we essentially have tracked the district court's compr ehensive opinion. We also note that the Supreme Court of New Jersey in Campione v. Adamar of N. J., Inc., 714 A.2d 299, 301, 305-06 (N.J. 1998), discussed the countermeasures the New Jersey Casino Control Commission has allowed the casinos to take against card-counters. Of course, the casinos' use of these countermeasures is at the heart of this case.

2. Inasmuch as the complaint references and relies on the content of certain documents, we consider them on this appeal. See Churchill v. Star Enter., 183 F.3d 184, 190 n.5 (3d Cir. 1999); Rose v. Bartle, 871 F.2d 331, 339 n.3 (3d Cir. 1989). Indeed, this case is unusual as the appendix consists of four volumes and thus is of a length which might be expected on an appeal from a summary judgment rather than on appeal from a motion to dismiss.

4

favor of the casinos and, indeed, to turn the odds in their favor. The corporate appellants are associated with appellant Doug Grant, Inc., a New Jersey corporation, whose predecessor corporations operated car d-counting schools and mock casinos established by the appellant, Doug Grant, a renowned card-counter . Doug Grant, Inc. also provided the training for several cooperative player groups, including many of the appellants her e, who pooled their financial resources and agr eed to share their blackjack winnings.

A. The Play of Blackjack, Card-Counting and Shuffling-
     At-Will and Other Countermeasur es

The gravamen of appellants' complaint is that the casinos have taken countermeasures that the appellants regard as illegal to eliminate the advantage that a skilled card-counter may have over them in playing blackjack, the one casino game in which a player's skill may incr ease his chance of winning to the point of eliminating the winning odds in favor of the "house." See Campione v. Adamar of N. J., Inc., 714 A.2d 299, 301 (N.J. 1998). Car d-counters use intellect and memory to identify the time during the course of play when a player's odds of winning are better or worse. Thus, the individual appellants allege that the casinos have impaired their ability to win money from the casinos in blackjack. The corporate appellants allege that their schools and mock casinos were forced to close as a result of the casinos' countermeasures against car d-counters, and because of bomb threats, break-ins, destruction of property, theft of student lists, stalking and other intimidation tactics.

It is necessary for us partially to describe how blackjack games are run in order to put appellants' allegations in context. Blackjack is played with decks containing 52 cards of four suits (hearts, diamonds, clubs and spades) with each suit containing 13 cards (Ace, King, Queen, Jack, 10, 9, 8, 7, 6, 5, 4, 3, 2). See N.J.A.C. S 19:46-1.17. Before a blackjack game starts, the dealer receives one or more, usually between six to eight, card decks fr om a casino supervisor and inspects them in the presence of the floorperson. See id. S 19:47-2.4(a). After inspecting the cards, the dealer takes them to a blackjack table and

5

spreads them out in a fan, face upward, for visual inspection by the first player or players to arrive at the table. See id. S 19:47-2.4(b). After these players are afforded an opportunity to inspect the cards, the dealer turns them face downward on the table, mixes them thor oughly, and shuffles them until they are "randomly intermixed." The dealer then places the cards into a stack. See id. S 19:47-2.4(c); id. S 19:47-2.5(a). After the shuffling is completed, the dealer asks the player seated at a particular position at the table, as defined by the regulations of the Casino Control Commission ("CCC"), the casino r egulatory agency, id. 19:47-2.5(e), to cut the deck. See id. S 19:47-2.5(b). The player cuts the deck by placing a plastic cutting card in the stack at least ten cards from either end. See id. S 19:47-2.5(c).

Once the player has inserted the cutting car d, the dealer takes all the cards in front of the cutting card and places them at the back of the stack. See id. S 19:47-2.5(d). The dealer then takes the entire stack of shuffled cards and cuts and aligns it along the side of the dealing shoe which has a mark on its side enabling the dealer to insert the cutting card so that it is in a position "at least approximately" one-quarter of the way fr om the back of the stack. See id. S 19:47-2.5(d); id. S 19:46-1.19(d)(4). The dealer then inserts the stack of cards into the dealing shoe for commencement of play. See id. S 19:47-2.5(d). The cards behind the cutting card will not be used during the game.

Once play has commenced the dealer deals the car ds to the players in a series of hands until the dealer r eaches the cutting card. When the dealer reaches the cutting card, the dealer repeats the shuffling process and cutting procedures described above. See id. S 19:47-2.5(h).

A blackjack player's object is to reach as close as possible to a total card value of 21 without exceeding that value. A player exceeding 21 loses regardless of the dealer's subsequently acquired hand. Persons in the casino industry and card-counters have come to r ecognize that, in a player's endeavor to reach a value as close as possible to 21, certain cards are more favorable to the player and certain cards are more favorable to the dealer. In particular, appellants assert that the Ace, King, Queen, Jack and Ten

6

are favorable to a player, but the 6, 5, 4, 3, and 2 are favorable to the dealer and thus to the house. The 7, 8, and 9 are said to be neutral. At any point during the play, the cards in a shoe can contain more player –favorable cards or more dealer–favorable cards. When there are more player–favorable cards, a player's chances of winning are increased but when there are more dealer –favorable cards, the dealer's chances of winning are increased. Whether and when a shoe will turn out to be player – or dealer-favorable is purely random.

Card–counters attempt to "count cards" to determine whether and when a shoe is player-favorable. They then vary their bets, i.e., betting high when the shoe is player-favorable and low when the shoe is dealer-favorable to increase their chances of having a winning r ound of play. Bets are placed before each individual r ound of blackjack, usually within established minimum and maximum limits for the table. According to the appellants, successful card-counting contains several basic elements including the assignment of a point value to each card, maintaining a running total of those points during play, betting strategies, playing strategies, money management, a sufficient bankroll, and "the intangible ability to consistently apply these interrelated strategies under fast-paced casino conditions." See app. at 24.

For maximum advantage, card–counters need to be able to view, through the rounds of play, as many of the cards in the shoe as possible. The greater number of cards they are able to view, the easier it is for them to determine to whom the remaining cards in the shoe ar e favorable. For this reason, card-counters prefer that the dealer place the cutting card toward the end of the shoe, leaving a small number of cards behind the cutting-card and increasing the overall number of cards in play. Car d-counters also prefer to have the entire shoe of car ds played. If the dealer reshuffles prior to reaching the cutting card, then the card-counters' opportunity to bet high on a shoe with a remainder of mostly player-favorable car ds is impaired.

The casinos, on the other hand, prefer to decr ease the card-counters' opportunity to bet high on a player-favorable shoe. Therefore, it is in their inter est to decrease the card–

7

counters' chances of determining whether a shoe is player-favorable by playing with fewer cards in the shoe, i.e., placing the cutting card as far from the back of the stack as permitted by the CCC regulations. It is also in the casinos' interest to reshuffle prior to reaching the cutting card when the remaining cards in a shoe are player-favorable. These practices, however, come at a cost to the casino as the more often the dealer goes thr ough the meticulous shuffling process, the shorter the actual time of play and thus the smaller the casino's profits.

Appellants allege that the casinos maintain car d-counting teams and/or video and computer surveillance equipment to identify card-counters and inform the dealers of their participation in a blackjack game so that the dealers can take countermeasures against them. Appellants challenge these practices, claiming they violate the New Jersey "cheating games" section in the Casino Contr ol Act, N.J. Stat. Ann. S 5:12-115 (West 1996), which provides that it shall be unlawful:

> Knowingly to deal, conduct, carry on, operate or expose for play any game or games played with cards . . . which have in any manner been marked or tamper ed with, or placed in a condition, or operated in a manner, the result of which tends to deceive the public or tends to alter the normal random selection of characteristics or the normal chance of the game which could determine or alter the result of the game.

The appellants make several specific allegations to support their claims. See Doug Grant, 3 F . Supp.2d at 524-25. First, they argue that the card-counter identifying process fundamentally is flawed because it tends unfairly to misidentify non-card-counters as card-counters. They claim casinos define card-counters as (1) any patr on who increases a bet during a player-favorable count, or (2) any patron who knows or is related to someone who has increased a bet during a player-favorable count. According to appellants, a player the casino identifies as a card-counter is "branded for life" and never is able to play a "fair" game of blackjack without being subjected to countermeasures. The casinos allegedly share information about suspected card-counters through defendant Griffin

8

Investigations and other similar agencies. These agencies allegedly keep dossiers containing the pictur es of suspected card-counters which casino employees then use to spot card-counters for the purpose of knowing when to implement countermeasures.

Second, appellants claim that the casinos utilize what they term the "cheating-at-will" pr eferential shuffle and which, as codified by the CCC regulations, generally is known as the "shuffle-at-will." A dealer r eshuffling prior to reaching the cut-card marker shuffles-at-will. A casino will shuffle in this manner when its card-counting team determines that the shoe is player-favorable at a table where it suspects card-counters ar e playing. Appellants allege that the shuffle-at-will provides an extra 2% advantage to the casino, nearly double its nor mal chance of winning, and thus providing the casinos with a windfall of millions of dollars. Id. at 525. They also claim that a casino can shuffle-at-will abusively to the disadvantage of players who are not card-counters by shuffling-at-will even when its employees do not suspect that there is a card-counter playing at a table. Id.

Appellants recount specific instances in which individual appellants allegedly were subjected to shuffling-at-will by specific casinos throughout the past ten years. On some, but not all, of these occasions, the player r eported the shuffle-at-will to the CCC and/or the New Jersey Department of Gaming Enforcement ("DGE") official on-site at every casino. According to appellants, the casinos never have responded to such complaints by admitting to counting cards and shuffling during a player -favorable count. Id.

Appellants also allege that because they have been identified as card-counters, they are limited to one wager at a time, are refused cards, have bets pushed back, and are forced to bet below the original posted limit at the table. Id. Moreover, they allege that "shills" associated with the casinos sometimes occupy all seats at tables at which they wish to play. Id. The appellants allege that they have been treated in these adverse ways even though players who are not card-counters are not so treated.

Appellants also claim that the casinos have denied them hospitality "comps," such as meals, after identifying them as card-counters. Id. Finally, appellants allege that they have been threatened, assaulted and stalked because of their suspected card-counter status. Id. They allege that they have been threatened in person while at the casinos by both known and unknown casino employees and that they have been threatened and sent pornographic materials over the Internet by unnamed John Does allegedly connected to the casinos. Id.

B. The Casino Control Act and CCC Regulations

The New Jersey Casino Control Act, N.J. Stat. Ann. S 5:12-1 et seq. (West 1996) (the "Act"), gives the CCC comprehensive authority to define and r egulate the rules and conduct of play for blackjack and other authorized casino games. See Campione, 714 A.2d at 304; Uston v. Resorts Int'l Hotel, Inc., 445 A.2d 370, 372-73 (N.J. 1982). It also grants the CCC "exclusive jurisdiction" over the interpretation and enforcement of r egulations governing "all matters delegated to it or within the scope of its powers under the provisions of [the Act]." N.J. Stat. Ann. S 5:12-133b; see also id. 5:12-69, 70. That jurisdiction delegates to the CCC the power to promulgate regulations regarding the rules of casino games, including blackjack, id. SS 5:12-69-70f, gambling related advertising, id. S 5:12-70o, and the enforcement of gaming regulations, including the investigation, adjudication, and punishment of r egulatory violations, id. SS 5:12-63b, f, g;id. S 5:12-64; id. S 5:12-129.

The regulations governing blackjack ar e exhaustive and set forth in great detail the rules for the conduct of the game. See N.J.A.C. S 19:47-2.1 et seq. Indeed, the New Jersey Supreme Court has stated that, "[i]t is no exaggeration to state that the Commission's r egulation of blackjack is more extensive than the entir e administrative regulation of many industries." Uston , 445 A.2d 373. The CCC is very aware of the card-counter controversy. As the parties have recognized, the CCC carefully has considered and addressed in its regulatory capacity the effect card-counters can have on the game and the ways in which casinos should be permitted to respond to professional card-counters. See, e.g., 14 N.J. Reg. 467-70 (May 17,

10

1982); 14 N.J. Reg. 559–69 (June 7, 1982); 14 N.J. Reg. 841 (Aug. 2, 1982); 23 N.J. Reg. 1784 (June 3, 1991); 23 N.J. Reg. 2613 (Sept. 3, 1991); 23 N.J. Reg. 3350 (Nov. 4, 1991); 23 N.J. Reg. 3354 (Nov. 4, 1991); 25 N.J. Reg. 3953 (Sept. 7, 1993); 25 N.J. Reg. 5521 (Dec. 6, 1993). The CCC regulations authorize the casinos to use certain countermeasures to prevent car d-counters from overcoming the statistical advantage that is necessary to ensur e the casinos' financial viability.

The CCC adopted many of its regulations authorizing countermeasures in response to the New Jersey Supreme Court's ruling in Uston, 445 A.2d 370, a case considering whether casinos have the authority to exclude car d-counters from their premises. The court determined that casinos were not authorized to exclude car d-counters, reasoning that the Act gave the CCC exclusive and plenary authority to set the rules and methods of play of casino games and that the CCC had not authorized the exclusion of card-counters as a countermeasur e.3 The court suggested, however, that if the CCC wanted to approve measures to neutralize the card-counter threat, it might be able to exclude card-counters, provided that the regulation did not violate constitutional or statutory limits. Uston, 445 A.2d at 375–76.

Yet, prior to Uston, the CCC had codified a practice which the casinos used as a card-counter counter measure even though the CCC did not promulgate it for that purpose. This regulation provides that: "[a] casino licensee, in its discretion" may permit a player to "wager on [more than] one box at a Blackjack table." N.J.A.C. S 19:47–2.14. The CCC had been allowing the use of this practice against card-counters through its approval of casinos' internal control pursuant to N.J. Stat. Ann. S 5:12–99. The rule specifically grants casinos discretion to allow players (usually non-card-counters) to bet on mor e than one box, and presumably, in light of the discretionary language, allows them to preclude card-counters fr om betting on more than one box.

_____

3. It appears that prior to Uston the casinos on at least some occasions excluded card-counters and did so with "overwhelming force." See State v. Sanders, 448 A.2d 481, 485 (N.J. Super . Ct. App. Div. 1982).

After Uston, the CCC held a series of hearings on the issue of card-counters and decided to enact r egulations authorizing the casinos to use certain measur es to neutralize the potential negative effect car d-counters could have on their financial viability. See Campione, 714 A.2d at 305. The new regulations, which the New Jersey Supreme Court urged the CCC to consider in lieu of allowing the casinos to exclude card-counters, balanced the statutory goals of casino viability and fair odds to all players. See N.J. Stat. Ann. S 5:12-100e. The CCC intended the regulations to ensure both the fair ness and integrity of casino gambling and "the right of the casinos to have the rules drawn so as to allow some reasonable pr ofit." Uston, 445 A.2d at 376; see also 14 N.J. Reg. 560-61 (June 7, 1982); 23 N.J. Reg. 1784 (June 3, 1991).

Several of these countermeasures involved the manner by which casinos could shuffle the blackjack car ds. The first approved shuffling method is known as the"Bart Carter Shuffle," a "shuffling procedur e in which approximately one deck of cards is shuffled after being dealt, segregated into separate stacks and each stack is inserted into pr emarked locations within the remaining decks contained in the dealing shoe." N.J.A.C. S 19:47-2.1; see also 14 N.J. Reg. 559 (June 7, 1982); 14 N.J. Reg. 841 (Aug. 2, 1982). The CCC also approved the "shuffle-at-will," which we have described above, to allow the casinos to shuffle after any round of play. To implement this appr oval, the CCC amended the existing shuffle regulation by adding language regarding the casinos' authority to shuffle "after each round of play":

>     (a) Immediately prior to commencement of play, after any round of play as may be determined by the casino licensee and after each shoe of cards is dealt, the dealer shall shuffle the cards so that they are randomly intermixed.
>
>     . . .
>
>     (h) A reshuffle of the cards in the shoe shall take place after the cutting card is reached in the shoe . . . except that:

        1. The casino licensee may determine aft er each
        round of play that the cards should be r eshuffled;

        2. When the `Bart Carter Shuffle' is util ized a
        reshuffle shall take place after the car ds in the discard
        rack exceed approximately one deck in number .

N.J.A.C. S 19:47-2.5; see 14 N.J. Reg. 559 (June 7, 1982),
14 N.J. Reg. 841 (Aug. 2, 1982).

The CCC also has approved the use of a device known as
the continuous shuffling shoe. In place of the dealing and
shuffling requirements set forth in N.J.A.C. 19:47-2.5 and
2.6, a casino licensee may utilize a dealing shoe or other
device designed to reshuffle the cards automatically,
provided that the CCC or its authorized designatee has
approved such shoe or device and the pr ocedures for
dealing and shuffling the cards through the use of this
device. See N.J.A.C. S 19:47-2.21; see also 14 N.J. Reg. 559
(June 7, 1982), 14 N.J. Reg. 841 (Aug. 2, 1982).

The shuffling regulations, particularly the most
commonly used shuffle-at-will, have enabled the casinos to
lessen the card-counters' ability to deter mine whether cards
remaining in the shoe are player-favorable. As we already
have noted, when the cards are reshuffled continuously or
prior to the dealer reaching the cutting-car d in the shoe,
card-counters lose their potential advantage over the
casinos because they no longer can increase their bets,
secure in the knowledge that their chance of r eceiving
player-favorable cards has been incr eased.

The CCC also authorized one non-shuffling
countermeasure after the Uston decision--an increase in
the number of decks casinos are allowed to use in
blackjack play. See N.J.A.C. S 19:47-2.2. This change
helped the casinos combat card-counters by incr easing the
number of cards card-counters would need to track to
determine whether a shoe was player-favorable. Plainly, the
more cards in the shoe, the more difficult a player's task is
to keep track of the cards.

After the CCC authorized these initial counter measures,
in 1991 it approved another regulation which provides that:

[A] casino licensee may at any time change the permissible minimum or maximum wager at a table game, without notifying the Commission of such change, upon posting a sign at the gaming table advising patrons of the new permissible minimum or maximum wager and announcing the change to patrons who are at the table.

N.J.A.C. S 19:47-8.3(c); see also 23 N.J. Reg. 1784 (June 3, 1991); 23 N.J. Reg. 2613 (Sept. 3, 1991); 23 N.J. Reg. 3350 (Nov. 4, 1991); 23 N.J. Reg. 3354 (Nov. 4, 1991). This regulation gives the casinos the authority to lower the betting limit whenever it identifies a car d-counter so that the card-counter will not be able to bet high when the shoe becomes player-favorable. Then, in 1993, the CCC made a further addition to its regulations which, as further amended in 1999, provides:

(b) A casino licensee may offer:

1. Different maximum wagers at one gaming table for each permissible wager in an authorized game; and

2. Different maximum wagers at dif ferent gaming tables for each permissible wager in an authorized game.

(c) A casino licensee shall provide notice of the minimum and maximum wagers in effect at each gaming table, and any changes thereto, in accor dance with N.J.A.C. 19:47-8.3.

(d) Notwithstanding (c) above, a casino licensee may, in its discretion, permit a player to wager below the established minimum wager or above the established maximum wager at a gaming table.

(e) Any wager accepted by a dealer which is in excess of the established maximum permitted wager at that gaming table shall be paid or lost in its entir ety in accordance with the rules of the game, notwithstanding that the wager exceeded the current table maximum or was lower than the current table maximum.

N.J.A.C. 19:47-8.2(b) to (e); see 25 N.J. Reg. 3953 (Sept. 7, 1993); 25 N.J. Reg. 5521 (Dec. 6, 1993). This r egulation

14

clarified that the casinos could limit specifically the wagers of only those patrons identified as car d-counters, while permitting non-card-counters to continue betting at higher limits.

The New Jersey courts seem not to doubt the legality of the CCC-authorized countermeasures. In particular, the trial court in Campione recognized that the practice of "shuffling at will," the central concer n in this case identified by the district court, is authorized by CCC r egulation, see N.J.A.C. S 19:47-2.5, and affects all patrons, even those not counting cards, at a blackjack table. See Campione v. Adamar of N. J., Inc., 643 A.2d 42, 50-51 (N.J. Super. Ct. Law Div. 1993), rev'd on other gr ounds, 694 A.2d 1045 (N.J. Super. Ct. App. Div. 1997), mod. and af f 'd, 714 A.2d 299 (N.J. 1998). Further, on appeal in Campione, the New Jersey Superior Court, Appellate Division, found that the CCC "authorizes the disparate treatment of card-counters." 694 A.2d at 1050. The court noted that the CCC has approved the countermeasures allowing for betting limits and permitting casinos to vary the number of boxes in which particular players can wager. Id. at 1047. Finally, the New Jersey Supreme Court in Campione, while not expressly upholding the countermeasur es the CCC has allowed, implicitly made it clear the CCC lawfully may permit such countermeasures. 714 A.2d at 305, 308.

## II. JURISDICTION

The complaint in this action alleged violations of the United States Constitution, 42 U.S.C. S 1983, and the federal RICO statute, as well as causes of action under the New Jersey RICO statute, constitution and common law. Thus, the district court had jurisdiction under 28 U.S.C. SS 1441, 1331, and 1367. We have jurisdiction pursuant to 28 U.S.C. S 1291.

## III. STANDARD OF REVIEW

Our review of a district court's order of dismissal of a complaint pursuant to Rule 12(b)(6) for failur e to state a claim upon which relief may be granted, is plenary and we apply the same test as the district court. See Maio v. Aetna,

15

Inc., 221 F.3d 472, 481 (3d Cir. 2000). Thus, "[a] motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." Id. at 481-82. However, while our standard of r eview requires us to accept as true all factual allegations in the complaint,"we need not accept as true `unsupported conclusions and unwarranted inferences.' " City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir . 1998) (quoting Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997)). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." Id. at 263.

IV. DISCUSSION

A. RICO Claims

Appellants' first count alleges claims for racketeering under federal RICO, 18 U.S.C. S 1964(c), New Jersey RICO, N.J. Stat. Ann. S 2C:41-4c (West 1995), and the RICO provisions of the Act, N.J. Stat. Ann. S 5:12-127c (West 1996). As appellees point out, the predicate acts of alleged racketeering on which appellants' base their RICO claims consist almost exclusively of the use of counter measures or alleged violations of other CCC regulations. In order to make out a RICO claim, appellants first must show that the casinos committed the predicate criminal acts enumerated by RICO. See, e.g., 18 U.S.C. SS 1961, 1962. Appellants claim that the casinos committed the following pr edicate acts: shuffling-at-will when the count was player -favorable, using computer and video technology to assist in counting cards and identifying card-counters, denying comps to appellants, using shills, limiting plaintiffs to one hand of blackjack at a time, lowering betting limits, and failing to disclose the use and nature of the disputed countermeasures. See br. 30-41; Doug Grant, 3 F. Supp.2d at 531-32. Based on the premise that these uses of

16

authorized countermeasures and other alleged regulatory violations are criminal acts, appellants' complaint alleges that the casinos' operation of blackjack violates criminal statutes regarding unlawful debt collection, transmission of gambling information, operation of illegal gambling business, and interstate commerce for an unlawful activity.

The district court believed that the primary purported predicate act on which appellants relied is the shuffling of cards when the count is favorable to the players.4 The complaint alleges that use of the "shuffling-at-will" countermeasure constitutes a predicate act of racketeering because it violates the criminal casino "cheating" statute, N.J. Stat. Ann. S 5:12-115. The trial court in Campione rejected this precise claim. Campione , 643 A.2d at 51 ("labeling of the shuffling at will as `cheating' is specious"). Moreover, despite appellants' pr otestations, the regulation itself makes clear that a casino at its discr etion may shuffle at the conclusion of any round of play:

> (a) Immediately prior to commencement of play, after any round of play as may be determined by the casino licensee and after each shoe of cards is dealt, the dealer shall shuffle the cards so that they are randomly intermixed.
>
> . . .
>
> (h) A reshuffle of the cards in the shoe shall take place after the cutting card is reached in the shoe as provided in N.J.A.C. 19:47-2.6(1) except that:
>
>  1. The casino licensee may determine after each round of play that the cards shall be r eshuffled.

_____

4. In their brief, the appellants contend that the district court was incorrect in this characterization, as their"central concern is the deceptive, unadvertised and clandestine use of countermeasures only when the cards favor players." See br. at 31. We will not linger on this point for two reasons. First, the casinos take their countermeasures quite openly. For example, it should be appar ent to anyone at a table when the dealer shuffles before the cutting card is reached. Second, it seems clear that, as the district court recognized, the principal countermeasure is shuffling-at-will.

17

N.J.A.C. S 19:47-2.5(a), (h).

Appellants attempt at length to skew the plain meaning of this regulation and the relevant r egulatory history leading to its adoption to convince us that the CCC has authorized only a "random shuffle-at-will," i.e., not a reshuffle that occurs only during player favorable counts. See br. at 33. Appellants' restrictive interpretation of the shuffle-at-will regulation, however, runs contrary to its express language.

The regulatory history makes clear that the CCC is fully aware of and allows the practice of shuffling-at-will when there is a player-favorable count as a countermeasure against card-counters. When the CCC published the proposed regulation to allow the casinos to shuffle-at-will, it noted that the casinos might shuffle when the count is favorable and that this practice might affect the odds of the game:

> The economic impact of this proposed amendment would vary depending on when in fact the car ds were shuffled. For example, if the cards wer e always shuffled after the first round of play regar dless of the point count, then the casino advantage against the basic strategy player and average player would probably remain the same with the advantage enjoyed by the card counter being decreased. If the car ds, however, were only shuffled in positive point count situations and not in negative point count situations, the casino advantage against all types of players would incr ease.

14 N.J. Reg. 470 (May 17, 1982).

Appellants appear to take issue with the propriety of the shuffle-at-will regulation. But even assuming that in this action we should entertain a challenge to the r egulation, we perceive nothing illegal in it.5 In any event, even if the

_____

5. There have been numerous state administrative and judicial proceedings regarding the issues before us but it is difficult from the parties' briefs and appendix to discern their exact status. In any event, we do not find any state determination inconsistent with the result we reach. Significantly, the parties are in agreement that shortly after

regulation is an improper exercise of the CCC's authority, a conclusion that we reject, a casino following it before its invalidation hardly could be subject to RICO liability for that conduct. In our view, a casino does not commit a predicate RICO act when it engages in conduct the CCC expressly permits.

We are disturbed that appellants have couched their arguments in dramatic hyperbole obfuscating the real issues. Indeed, we are satisfied that the appellants have mischaracterized the facts. For instance, appellants characterize the use of the shuffle-at-will as "secretly removing cards from a blackjack game in progress." See br. at 30. But the reshuffle is hardly secr et as the dealer does it openly in the view of the players. Moreover , a dealer reshuffling does not remove cards from the deck. Rather, the reshuffle simply places the cards in a different random order for the next hands.

Appellants further allege that the shuffle-at-will is a RICO criminal predicate act because it has a tendency to alter the normal random chance of the game. See br. at 32-39. What appellants fail to realize, however, is that the normal random chance of the game is defined pursuant to the statutory rules and CCC regulations. As the CCC has explained:

> [T]he normal chance and random character of any casino game is necessarily defined and deter mined by the rules governing the conduct of the game. Since the Commission has the statutory authority to initially establish the rules of the game, N.J.S.A. S 5:12-100e

_____

appellants filed this action, the individual appellants "filed a petition with the CCC with claims identical to those raised in the federal complaint." See appellants' br. at 4; appellees' br. at 5-6. In addition, the individual appellants later filed a declaratory petition with the CCC seeking its "interpretive ruling on pr ovisions of the Act, blackjack regulations and casino practices that ar e at issue in this appeal." See appellants' br. at 6; appellees' br. at 6. Apparently, appellants were not satisfied with the outcome of the declaratory petition, see 31 N.J. Reg. 555 (Feb. 16, 1999), as they have appealed fr om the determination to the New Jersey Superior Court, Appellate Division.

19

> and 70f, and primary jurisdiction to resolve any issues concerning interpretation of the Act and the rules promulgated thereunder, . . . it is absurd to allege that practices approved by the Commission as being consistent with its rules constitute `cheating' under section 115 of the Act.

31 N.J. Reg. 556 (Feb. 16, 1999). While appellants may wish to have the CCC rethink the scope of the shuffle-at-will regulation, we are satisfied that after being stripped of its conclusory legal dressing, there is no allegation in the complaint regarding reshuffling sufficient to support a RICO claim against the casino defendants.

Appellants' other alleged predicate acts ar e similarly insufficient to support a RICO claim. The alleged violations of criminal statutes regarding unlawful debt collection, 18 U.S.C. S 1962, transmission of gambling infor mation, 18 U.S.C. S 1084, interference with commerce by threats or violence, 18 U.S.C. S 1951, interstate commer ce for unlawful activity, 18 U.S.C. S 1952, and operating an illegal gambling business, 18 U.S.C. S 1955, all derive from the allegations regarding the use of authorized countermeasures and other alleged but in fact nonexistent violations of the CCC regulations. Any debts allegedly "unlawfully collected" are those lost by players during blackjack games played in accordance with the CCC regulations. Any "illegal gambling business" or "unlawful activity in interstate commerce" is simply the play of blackjack as authorized by the CCC. Similarly, the casinos do not engage "in unlawful activity" or "operating an illegal gambling business" by not offering appellants or anyone else "comps," which are nothing mor e than free gifts from the casinos. While appellants claim that the casinos are obliged to offer "comps," in our view if they fail to do so they are not committing criminal acts in any way impacting on the integrity of the blackjack game. If appellants want to bring a judicial action to recover the value of"comps," surely their forum should be a New Jersey state court, at least in some instances the small claims part. Plainly, the casinos' activities of which appellants complain do not constitute crimes and therefore ar e not predicate RICO acts.

20

Furthermore, appellants, although mentioning the use of "shills" in their complaint, have not made any allegations that the casinos violate the statutory prohibition of the use of "shills," i.e., persons who induce potential patrons to enter a casino or induce them to play any game. See N.J. Stat. Ann. S 5:12-1001 (West 1996). Certainly the casinos have not used shills to encourage appellants to play blackjack in their premises.

In their brief, appellants further assert that the CCC stated in an administrative proceeding that it would be deceptive for casinos actively to solicit a player to count cards in its casino without letting the player know that countermeasures will be used against those suspected of counting cards. See br. at 11, 25. Appellants, however, fail to cite the full text of the CCC's statement, which concluded:

> [T]he Commission does not believe that any of the exhibits submitted by the commenters come even close to supporting an allegation of active solicitation of card counter play by a casino licensee.

31 N.J. Reg. 556 (Feb. 6, 1999). Thus, appellants' r eference to the CCC's statement adds nothing to their allegation that the casinos' use of shills constitutes a RICO act.

Appellants also assert that it is deceptive for the casinos to fail to provide players with a complete text of the rules governing the play of blackjack. This allegation also fails to support a claim for relief. As we set forth above, the rules and regulations governing blackjack ar e numerous and thus they do not lend themselves to inclusion in a short manual. Further, the sample casino br ochure in the appendix explaining blackjack on its face is not deceptive. See app. at 832-34. While it does not purport to set forth all of the blackjack rules, it does give the infor mation needed by a player to play the game.

The appellants also allege that it is impermissible for the casinos to require one player's wager to be less than that of other players at the same table. See br . at 40 (citing N.J. Stat. Ann. S 5:12-100g (West 1996)). As we mentioned, however, the CCC has adopted a regulation that specifically allows casinos to set different wager limits, even among

21

players at the same table, if a player is suspected of card counting. See N.J.A.C. S 19:47-8.2(b)-(d). As a result, the casinos cannot be said to have violated the Act in a manner to support a RICO cause of action. While appellants may wish to challenge the propriety of the r egulation, they have not stated a RICO cause of action against the casinos whose actions are in compliance with the law and the CCC's regulations.

Appellants next argue that the casinos' failur e to obtain prior approval for the countermeasur es they implement constitutes a predicate act. See br . at 40-41. Yet appellants also recognize that the CCC has determined that the casinos do not need prior approval to implement the measures. See id. at 41. While the appellants note that that ruling is being challenged on appeal, it will be time enough for a federal court to consider the RICO implications if and when the CCC determines that the casinos' practices are illegal and the casinos do not comply prospectively with the CCC's determinations.

The only alleged predicate acts that ar e not based on CCC regulations are the allegations of assaults, threats, and stalking-in-person and via the Internet. Appellants allege that one appellant was knocked off his seat on one occasion, that some appellants were followed ar ound casinos, and that one appellant was grabbed by the arm while being escorted out of a casino. However , these minor altercations cannot be regarded as conduct egregious enough to serve as predicate acts sufficient to support what appellants apparently believe is massive litigation, in which, before trebling, they are seeking at least $347,532,800 in damages. See Doug Grant, 3 F. Supp.2d at 522 n.1. Nor do the appellants' claims of receiving anonymous pornographic, offensive and threatening messages over the Internet from John Doe defendants constitute predicate acts attributable to the appellees, as appellants put forth no basis for concluding or even alleging that anyone associated with the casinos sent the messages. Accor dingly, we will affirm the order of the district court dismissing the state and federal RICO causes of action.

For the reasons we have set forth, we have r eached the conclusion that appellants' allegations that the casinos or

22

any appellee has committed predicate RICO acts are completely insubstantial and border on the frivolous. In the circumstances, inasmuch as appellants have failed to allege any predicate act upon which to base a RICO claim, we need not determine conclusively whether appellants properly have pleaded injury to business or pr operty as required for a RICO damages action. See 18 U.S.C. S 1964(c); N.J. Stat. Ann. S 2C:41-4c (W est 1995); Maio, 221 F.3d at 483-84. Nevertheless, in this r egard we do make the following observation which demonstrates why this action, which has generated a large recor d and required a considerable expenditure of time and no doubt money is, at bottom, at least with respect to the claims we have considered, a fatuity.

Unlike an ordinary RICO victim, in this case the allegedly injured plaintiffs, i.e., the players, can avoid any injury simply by walking away from the alleged wr ongdoers, the casinos, by not playing blackjack in casinos. In fact, that is what the casinos apparently want them to do, at least as long as they count cards. While this abstention would deprive them of the opportunity to enrich themselves at the casinos' expense, surely it would be difficult to characterize that lost speculative opportunity as an injury to"business or property." If the appellants have played blackjack in the past, aware of the casinos' countermeasur es, and if they continue to play blackjack in the future in the hope of profiting by counting cards, they have suffered and will suffer self-inflicted wounds. Accordingly, at least with respect to individual players who are awar e of the casinos' countermeasures, it is difficult to consider this case within a RICO formulation.6

_____

6. In their brief, the casinos assert as an alter native ground for affirmance that the statute of limitations has run as to some of the appellants' claims. See br. at 14 & n.5. Appellants respond that they have alleged continuing violations that render their claims timely. See reply br. at 9. Appellants seem to overlook, however, that the corporate plaintiffs all ceased operations by 1992. See app. at 930-32. In the circumstances, inasmuch as appellants instituted this action in 1997, the corporate appellants' federal RICO claims ar e barred by the four-year RICO statute of limitations. See Forbes v. Eagleson, No. 99-1803, ___ F.3d. ___, 2000 WL 1529852, at *10 (3d Cir. Oct. 17, 2000).

B. Leave to Amend

The appellants originally pleaded a cause of action under the New Jersey Consumer Fraud Act, but omitted that claim in their amended complaint. In the district court, and here, they have asked permission to amend their complaint to reinclude the Consumer Fraud Act claim. The district court denied appellants leave to amend because it found that the Consumer Fraud Act claim was completely without merit and it would be futile to amend the complaint to include a meritless claim. See Doug Grant, 3 F. Supp.2d at 536-37.

As noted by the district court, the New Jersey Supr eme Court recently has held that the Consumer Fraud Act does not apply to a heavily regulated industry to the extent that application of the statute would create a "r eal possibility" of conflict between the Consumer Fraud Act, as administered by the Division of Consumer Affairs, and the r egulatory schemes of other administrative bodies. See Lemelledo v. Beneficial Mgmt. Corp. of Am., 696 A.2d 546, 553 (N.J. 1997). Thus, the Consumer Fraud Act is inapplicable where "the other source or sources of r egulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." Id. at 554.

Certainly the Casino Control Act evidences the New Jersey legislature's intent to vest in the CCC exclusive control of the regulation of casino gaming, including the content of related advertising. See N.J. Stat. Ann. S 5:12-133b (West 1996); id. S 5:12-70(o); see also Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1232-33 (3d Cir. 1994). If we allowed claims such as the appellants' proposed consumer fraud claim to proceed in the district court, we would interfere with the CCC's regulatory scheme. The regulation of the game of blackjack, including shuffling-at-will and the advertisement regulations, is within the exclusive jurisdiction of the CCC. Mor eover, the CCC has particularized expertise in these matters not possessed by courts and juries. While it is true that the Supreme Court of New Jersey in Campione, approving our opinion in Tose, see 714 A.2d at 307-08, held that the

24

courts were not ousted of jurisdiction over common law damage claims against casinos merely because the claims arose from gambling transactions, this holding does not inform our result here on the very different question of the applicability of a different regulatory act to casino operations with respect to running blackjack games. Thus, the district court properly denied appellants' motion for leave to amend for, as a matter of law, the amended complaint would not have stated a claim on which r elief could be granted. See Smith v. National Collegiate Athletic Ass'n, 139 F.3d 180, 190 (3d Cir. 1999), vacated on other grounds, 525 U.S. 459, 119 S.Ct. 924 (1999).

In reaching our result on this point, we emphasize that the goals of the Consumer Fraud and the Casino Contr ol Acts are not entirely consistent. The Consumer Fraud Act is concerned with the protection of consumers. The Casino Control Act, however, has dual purposes that must be balanced -- the protection of gambling patr ons and the protection of the financial viability of the casino industry. N.J. Stat. Ann. S 5:12-1b (12) (West 1996). Thus, the Casino Control Act presupposes that the consumers as a group, i.e., the players, will lose their money, a contemplated result that hardly is the object of the Consumer Fraud Act.

C. Dismissal Against John Does with Prejudice

The sixth count of the complaint alleges various state and federal statutory claims against John Does for sending offensive messages and alleged threats over the Internet. But while the appellants in the complaint sought r elief against the casino appellees for these acts, see app. at 104, they failed to offer any link between the John Does and the casinos. Thus, the district court properly dismissed this aspect of the complaint, though it did so with pr ejudice. We conclude, however, that the dismissal should have been without prejudice, allowing appellants to bring a claim at a later time if they uncover sufficient facts to per mit them to plead facts supporting a conclusion that the casinos were responsible for these acts. Accordingly, we will vacate the order dismissing the sixth count with pr ejudice to the extent that it included claims relating to the sending of the offensive messages and threats over the Internet, and with respect to that aspect of the order will r emand the matter

25

to the district court to modify the order so that it dismisses the count without prejudice.

## D. Constitutional and Civil Rights Claims

Appellants' sixth count also alleges violations of the Equal Protection Clause, the Due Process Clause, Article 1, paragraph 1 of the New Jersey Constitution, and 42 U.S.C. S 1983. As the district court correctly noted, this count fails to state a claim upon which relief can be granted for several reasons. First, appellants' allegations of state action are insufficient. State regulation and the CCC's authorization of casino activities do not transform the casinos into state actors. See Uston v. Hilton Hotels Corp., 448 F. Supp. 116, 118 (D. Nev. 1978); State v. Sanders, 448 A.2d 481, 486 (N.J. Super. Ct. App. Div. 1982) (sear ch by casino employees does not constitute state action). It is well established that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." Blum v. Yaretsky, 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 2786 (1982); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350–51, 95 S.Ct. 449, 453–54 (1974). Second, appellants have not suffered any equal protection clause violation inasmuch as under the rational basis test applicable for a non–protected class such as card–counters subject to CCC r egulations, see Bally Mfg. Corp. v. New Jersey Casino Contr ol Comm'n, 426 A.2d 1000, 1005 (N.J.) (casino regulations examined under rational basis test), appeal dismissed, 454 U.S. 804, 102 S.Ct. 77 (1981), the countermeasur es used by the casinos and authorized by the CCC are rationally related to the legitimate state interest in protecting the financial viability of the casino industry. See N.J. Stat. Ann. S 5:12–1b(12). Third, we are satisfied that the appellants do not have a constitutionally protected property interest in the opportunity to gamble and thus the activities of which they complain do not violate their due process rights. Therefore, the district court properly dismissed the constitutional and civil rights claims in the sixth count of the complaint for failure to state a claim upon which relief can be granted.7

_____

7. We hasten to add that we do not suggest that our holding means that the casinos have carte blanche in dealing with their patrons and they do not suggest otherwise. For example, both federal and state discrimination laws would be implicated if casinos discriminated among their patrons on the basis of their inclusion in protected groups.

## V. CONCLUSION

We have carefully considered all of appellants' arguments, including those that we may not have addressed specifically, and have concluded that the district court properly dismissed this action with pr ejudice with respect to the counts of the complaint that it addressed, except that it should have dismissed count six without prejudice to the extent that the count r elated to sending offensive messages and threats over the Internet.8 Consequently, we will modify the order of dismissal to provide that count six partially is dismissed without prejudice, and we otherwise will affir m the order of dismissal with prejudice, and will affir m the order remanding the remaining aspects of the complaint to the Superior Court of New Jersey. We will r emand the case to the district court to enter an order consistent with this opinion. Costs on this appeal will be taxed against appellants.

A True Copy:
Teste:

　　　Clerk of the United States Court of Appeals
　　　for the Third Circuit

_____

8. Immediately before oral argument on this appeal, appellants filed a motion requesting "an evidentiary hearing on possible conflicts of interest of the district court" because of what appellants said were their "serious concerns" that the court "may have undisclosed conflicts of interest or financial interests." W e have considered this application carefully and will deny the motion as we find it to be without merit. In any event, the appellants' "serious concer ns" are quite immaterial, as we have exercised plenary review on all the issues on this appeal so that it would not matter if the appellants' concerns were justified. While we recognize that we review the denial of a motion for leave to amend on an abuse of discretion basis, here we ar e upholding the denial on the legal basis that the proposed amendment would not survive a motion to dismiss under Rule 12(b)(6). See Smith, 139 F.3d at 190. Thus, we have not deferred to the district court on any issue on which we have passed.